UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMY M. GRACI,

                    Plaintiff,

v.

INDEPENDENT HEALTH ASSOCIATION, INC.,

                    Defendant.
_____

**REPORT AND
RECOMMENDATION**

05-CV-0231A(M)


       This case was referred to me by Hon. Richard J. Arcara, in accordance with 28 U.S.C. §636(b), for supervision of all pretrial matters and to hear and report upon dispositive motions (Dkt. ##5, 54).  Before me is the motion of defendant Independent Health Association, Inc. ("IHA") for summary judgment (Dkt. #42).  For the following reasons I recommend that the motion be denied.


**<u>BACKGROUND</u>**

       Plaintiff commenced this action on April 4, 2005, alleging wrongful termination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.* (Dkt. #1).

       Plaintiff alleges that she was hired by IHA as a Provider Relations Representative in June 1998 (Dkt. #1, ¶6; #43-1, ¶2).  In October 2000, she was promoted to the position of Provider Representative Specialist (Dkt. #43-1, Ex. F), and was responsible for answering telephone calls and responding to correspondence (#43-1, Ex. B).  Plaintiff suffers from several health conditions, including gastroenteritis and supraventricular tachycardia ("SVT") (Dkt. #48-

2, ¶3).   Throughout her employment with IHA, plaintiff had various absences from work due to health related problems (Dkt. #43-1, Ex. J).  Plaintiff was first placed on disability leave on November 13, 1998 for "syncope PSVT"[1] (Dkt. #43-1, Ex. D).  Plaintiff returned to work on April 1, 1999 on a part-time basis, and returned to full-time employment on January 5, 2000 (Id. at ¶7, Ex. E).  From the time she returned to work in April 1999 until April 2001, plaintiff utilized 25 sick days, some of which were accompanied by notes from her physician, Franklyn Campagna, M.D. (Id. at ¶15, Ex. J (attached physician's notes)).

Plaintiff's absences did not go unnoticed by IHA.  Her April 2001 annual evaluation by her supervisor, Amy Vitale, noted "the importance of calling if she will be absent or late.  It is important to realize the effect the absenteeism has on the unit and it's [sic] ability to meet goals" (Id. at Ex. H).  At that time plaintiff also reviewed her attendance for the year 2000, and signed an acknowledgment that the average use of sick time was 3 days, and that if her sick time exceeded this amount, it would impact customer service (Id. at Ex. I).  Plaintiff was again warned in December 2001 and  February 2002 by another supervisor, Rachel Ramirez, that she had no time off remaining, and that all future requests for sick time had to be accompanied by a note from her doctor or she would be terminated (Id. at Ex. K).

---

[1]     "PSVT" is paroxysmal supraventricular tachycardia and is also know as SVT (Dkt. #48-2, ¶4).

**Plaintiff's First termination**

Plaintiff's second disability leave began in April 2002[2].  At that time, plaintiff provided a note dated April 22, 2002 from Dr. Campagna, which stated that plaintiff was being treated by a gastroenterologist for acute gastroenteritis and was unable to work (Dkt. #43-1, Ex. N).

On April 30, 2002 plaintiff asked to be allowed to work from home because of her condition, an accommodation which plaintiff contends was made to other employees (Dkt. #48, Ex. F, 48-3, ¶12).  However, this request was denied by Judith Boyle, IHA's Vice President of Human Resources (Id. at Ex. D, p. 26).  (Id. at ¶23, Ex. P).

In May 2002, plaintiff completed a FMLA (Family Medical Leave Act) Notice and applied for disability benefits.  However, in June 2002, plaintiff's short-term disability claim was denied because there  was "insufficient information to support [her] medical restrictions and limitations . . . beyond May 13, 2002" (Id. at Ex. T).  Consequently, IHA notified plaintiff that because her FMLA leave was conditioned on her disability leave, plaintiff was required to return to work by June 10, 2002 or be terminated (Id. at Ex. U).  When plaintiff failed to return to work on June 10, 2002, Keith O'Brien, IHA's Assistant Director of Human Resources, advised her by letter that same day that she was terminated from employment, but that if her appeal of her disability claim was successful, IHA would "reinstate [her] position . . . and [would] restore [her] Family Medical Leave that was granted on April 29, 2002 based on [her] claim for disability benefits"  (Id. at Ex. V; see also Ex. Z).

---

[2]     The Complaint alleges that plaintiff's last day of employment was April 19, 2002 (Dkt. #1, ¶6).  However plaintiff states her last day was April 18, 2002 (Dkt. #43-1, ¶19), whereas her disability notice indicates that her last day was April 26, 2002 (Id. at Ex. P).

On September 16, 2002, plaintiff won her disability appeal and was awarded short-term disability benefits from May 13, 2002 through September 30, 2002 (Dkt. #43-1, Ex. BB).  Although IHA contends that it was unaware of this development until October 15, 2002 (Id. at ¶38; Ex. FF, October 14, 2002 entry),[3] the record shows that on September 16, 2002 IHA received a letter from the disability carrier indicating that plaintiff had received a payment representing her short-term disability benefits (Dkt. #48-1, Ex. F).  Although IHA had suggested to plaintiff that she return to work part-time (Dkt. #43-1, Ex. FF; 48-3, ¶29-31), after receiving a release from Dr. Campagna,  plaintiff returned to work on a full-time basis on October 10, 2002 (Dkt. #43-1, ¶40, Ex. CC).

### Plaintiff's Second Termination

On Friday, October 11, 2002, plaintiff's second day back to work, plaintiff learned that her father had been taken from his nursing home to the hospital (Dkt. #48-1, Ex. D, p. 100). Consequently, with a few hours remaining on her shift, plaintiff requested permission to leave work for the remainder of her shift, so that she could be with her ailing father and perform her duties as his health care proxy (Dkt. #48-1, ¶21).  Ms. Boyle denied the request (Id. at Ex. D., p. 84).  Plaintiff was advised that she had no available leave time, and could either resign or leave and be terminated (Id.)  Plaintiff elected to leave work to attend to her father, who died shortly thereafter (Id. at Ex. A, p. 2).

---

[3]     This contention is somewhat confusing because IHA permitted plaintiff to return to work on October 10, 2002, before it allegedly knew that plaintiff's disability determination was reversed.

By letter dated October 14, 2002, plaintiff was advised by IHA that at the time of her return to work on October 10, 2002, she "had exhausted all [of her] paid time off, and [her] 12 weeks of Family Medical Leave" (Dkt. #43-1, Ex. GG). Plaintiff was further advised that because she chose to leave work knowing the consequences, she had voluntarily "separated from employment" (Id.). However, despite IHA's claim that plaintiff voluntarily terminated her employment, the Unemployment Insurance Appeal Board ultimately concluded that plaintiff was eligible for unemployment benefits as a result of the second termination because "[t]he credible evidence establishe[d] that [plaintiff] did not voluntarily leave her job" (Dkt. #48-1, Exs. A and B).

Plaintiff filed a charge of discrimination with the EEOC on June 5, 2003 (Dkt. #43-1, Ex. HH). On September 29, 2004 the EEOC issued a determination, finding that:

> "The record is clear that [plaintiff] is a qualified individual with a disability, that [defendant] had attempted to terminate her employment in the past, and could have granted her leave without pay, at the minimum. Instead, the decision was made to terminate her employment, giving a strong indication that her disability was a motivating factor in its decision to terminate her employment" (Id. at Ex. II).

On December 29, 2004, the EEOC issued plaintiff a "right to sue" letter (Id. at Ex. JJ) and this action ensued.

## DISCUSSION AND ANALYSIS

### A.    Summary Judgment Standard

The standard to be applied on a motion for summary judgment in this Circuit is well settled. " 'Summary judgment is appropriate only if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law.  The party seeking summary judgment has the burden to demonstrate that no genuine issue

of material fact exists.  In determining whether a genuine issue of material fact exists, a court

must examine the evidence in the light most favorable to, and draw all inferences in favor of, the

non-movant.  Summary judgment is improper if there is any evidence in the record that could

reasonably support the jury's verdict for the non-moving party.' "  Ford v. Reynolds, 316 F. 3d

351, 354 (2d Cir. 2003) (quoting Marvel Characters v. Simon, 310 F. 3d 280, 285-86 (2d Cir.

2002)).

       However, while the moving party must demonstrate the absence of any genuine

factual dispute, the party opposing the motion "must do more than simply show that there is

some metaphysical doubt as to the material facts . . . .   [T]he nonmoving party must come

forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation marks and

citations omitted).  The Supreme Court has stated that trial courts should not "treat

discrimination differently from other ultimate questions of fact. "  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).


       **B.**    **ADA Discrimination**

       Claims of discrimination under the ADA are subject to the burden-shifting

analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36

L. Ed. 2d 668 (1973). See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty.

Adolescent Program, Inc., 198 F. 3d 68, 72 (2d Cir. 1999).  Under that framework, the plaintiff

bears the initial burden of establishing a *prima facie* case of discrimination.  If the plaintiff does

so, the burden then shifts to the defendant to offer a legitimate, lawful reason for its action.  If

the defendant articulates a non-discriminatory reason, "the McDonnell Douglas framework -

with its presumptions and burdens - disappear[], and the sole remaining issue [is] discrimination

*vel non*."  Reeves, supra, 530 U.S. at 142-43 (internal quotation marks omitted).  "[A]lthough

the presumption of discrimination drops out of the picture once the defendant meets its burden of

production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima

facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's

explanation is pretextual."  Id. (internal quotation marks omitted).  "In short, the question

becomes whether the evidence, taken as a whole, supports a sufficient rational inference of

discrimination."  Weinstock v. Columbia University, 224 F. 3d 33, 42 (2d Cir. 2000), cert.

denied, 540 U.S. 811 (2003).

          "Whether judgment as a matter of law is appropriate in any particular case will

depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the

probative value of the proof that the employer's explanation is false, and any other evidence that

supports the employer's case and that properly may be considered on a motion for judgment as a

matter of law."  Reeves, supra, 530 U.S. at 148; see also Schnabel v. Abramson, 232 F. 3d 83, 90

(2d Cir. 2000) ("[T]he Supreme Court's decision in Reeves clearly mandates a case-by-case

approach, with a court examining the entire record to determine whether the plaintiff could

satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff.' " (quoting Reeves, supra, 530 U.S. at 143)).

**1.      Did Plaintiff Establish a Prima Facie Case of Discrimination?**

To satisfy her initial burden at the summary judgment stage, plaintiff must make out a *prima facie* case of discrimination; however, she need not prove her claim by a preponderance of the evidence.  See Adams v. Rochester Gen. Hospital, 977 F. Supp. 226, 231 (W.D.N.Y. 1997).  To do so, plaintiff must show that: (1) the defendant is covered by the ADA, (2) she is disabled within the meaning of the ADA, (3) she can perform the essential functions of her job with or without a reasonable accommodation, and (4) she was subject to an adverse employment action because of her disability. See Ryan v. Grae & Rybicki, P.C., 135 F. 3d 867, 869-70 (2d Cir. 1998).  IHA appears to concede all aspects of plaintiff's *prima facie* case with the exception of whether plaintiff is disabled within the meaning of the ADA (Dkt. #47, p. 11).

Under the ADA, a disability is defined as

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment."  42 U.S.C. §12102(2).

The Supreme Court has articulated a three-step approach for determining whether a plaintiff has a disability under the first definition of "disability" in the statute. See Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540 (1998).  First, I must determine whether the plaintiff suffers from a qualifying physical or mental impairment; second, I must identify the activity that plaintiff claims is impaired, and then determine whether that activity constitutes a "major life activity"; finally, I must determine whether the plaintiff's impairment "substantially limited" the identified major life activity. Id., 524 U.S. at 631.

-8-

IHA contends that although plaintiff's gastroenteritis and SVT may constitute physical impairments within the meaning of the ADA, she was not disabled because her impairments did not substantially limit her major life activities (Dkt. #44, pp. 13-14).  With respect to her gastroenteritis, IHA relies primarily on plaintiff's deposition testimony that she was able to take care of herself, drive and otherwise function and that her SVT was controlled with medication (Dkt. 44, pp. 14-15).

In response, plaintiff relies on the affirmation of Dr. Campagna in which he opines, based on his treatment of plaintiff  from 1998 through present, that during the period between 1998 and 2002 plaintiff's SVT "substantially limited a number of major life activities, including but not limited to caring for herself, her children and performing chores around the home, working, as well as her leisure activities" (Dkt. #48-2, ¶20).  Dr. Campagna explained that "[a]lthough [plaintiff] returned to work . . . on October 10, 2002, her return to work did not mean that her [SVT] was in any way cured, but instead since here [*sic*] condition is permanent in nature, she has and will always be subject to continued flare-ups or reoccurrences of these symptoms at any time, even with the use of medications" (Id. at ¶21).  In sum, he concluded that plaintiff "has and will continue to have a permanent disability that will substantially limit one or more of her major life activities, over time" (Id. at ¶22).

IHA argues that plaintiff should be prohibited from using  Dr. Campagna's affidavit because he was never identified as an expert witness or disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(B) (Dkt. #52, Point I).  However, "the majority of courts now follow the rule that an expert report is not required from treating physicians except when that physician will testify to matters learned outside the scope of treatment.  A treating physician may state 'expert'

facts to the jury in order to explain his or her testimony without being considered an expert

witness".   6 Moores Federal Practice (Third Ed. 2007) §26.23[2][b]; see also Bank of China,

New York Branch v. NBM LLC, 359 F. 3d 171, 182 n.13 (2d Cir. 2004); Salas v. United States,

165 F.R.D. 31, 33 (W.D.N.Y. 1995) (Heckman, MJ).

      Mindful that the plaintiff's obligation "to make out a *prima facie* case is not a

demanding burden" Greenway v. Buffalo Hilton Hotel, 143 F. 3d 47, 52 (2d Cir. 1998),  I find

that plaintiff has established a *prima facie* case of disability discrimination.


      **2.**      **Was IHA's Reason for Terminating Plaintiff**
                **A Pretext for Discrimination?**

      IHA next argues that the presumption created by plaintiff's *prima facie* case is

rebutted by its legitimate non-discriminatory reason for terminating plaintiff's employment,

namely her leaving work during her shift without any time off accrued (Dkt. #44, pp. 19-20).  I

agree.  See Lees v. The Case-Hoyt Corp., 779 F. Supp. 717, 728 (W.D.N.Y. 1991) (Larimer, J.)

("An employer has a legitimate business interest in requiring their employees to arrive by a

specific time" (citations omitted)).  Consequently, to survive summary judgment, the burden

shifts to plaintiff to "show that the proffered reason was merely a pretext for discrimination,

which may be demonstrated either by the presentation of additional evidence showing that the

employer's proffered explanation is unworthy of credence, or by reliance on the evidence

comprising the prima facie case, without more." Sista v. CDC Ixis North America, Inc., 445 F.

3d 161, 173 (2d Cir. 2006) (internal quotation marks omitted).

      IHA contends that plaintiff was terminated because she had insufficient leave to

permit a several hour absence as a result of a family emergency.  In support of its argument that

plaintiff was not entitled to discretionary unpaid leave, IHA argues that plaintiff "had already been granted 30 days of unpaid leave after the 12 weeks of her FMLA leave and therefore was not entitled to any more unpaid leave, no matter how urgent the circumstances" (Dkt. #52, ¶49; Ex. G, pp. 42-43).  However, this argument is belied by IHA's Employee Handbook, which limits "[a]n unpaid leave of absence . . . *for other than* annual leave, personal leave, sick leave, *disability*, or family leave is limited to a maximum of one (1) month *unless other arrangements* are approved by the employee's direct supervisor, department head, and the President/CEO" (Dkt. #52, Ex. F, p. 18 (emphasis added)).  Here, prior to plaintiff's return to employment, she was granted short-term disability benefits from May 13, 2002 through September 30, 2002 (Dkt. #43, Ex. BB).  Therefore, because her absence was attributable to a disability, it is at least arguable that she did not utilize her one-month of unpaid leave.  In any event, the Employee Handbook gives IHA the discretion to extend unpaid leaves beyond one month, and does not limit the number of unpaid leaves available to an employee (Dkt. #52, Ex. F, pp. 18-19).

　　　　　While acknowledging that discretionary unpaid leave was permitted for such mundane events as allowing an employee to extend his/her vacation, Ms. Boyle contended that unpaid leave was not available to plaintiff, despite the exigent circumstances for her request, because she had "hit the six month rule" (Dkt. #48-1, Ex. D, pp. 76, 93, 96, 121).  According to Ms. Boyle, the six month rule meant that an employee who missed more than six months in a twelve month period would be terminated and placed on a preferential hire list  (Id. at p. 93).  However, by IHA's own admission, plaintiff was only "provided twenty three weeks of leave during the preceding twelve month period" (Dkt. #44, p. 23).  Consistent with this position, plaintiff alleges that Ms. Boyle advised her that she had returned one day <u>before</u> the six month

rule (Dkt. #48-3, ¶26).  Such inconsistencies in IHA's explanation for why discretionary unpaid

leave was unavailable to plaintiff supports her claim of discrimination.  See Reeves, supra, 530

U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form

of circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive.").

        Considering the totality of the circumstances, I conclude that there is a genuine

issue of material fact as to whether IHA's reason for terminating plaintiff was merely a pretext

for discrimination.


### C.    ADA Retaliation

        When evaluating a claim of retaliation under the ADA, courts also use the

McDonnell Douglas burden shifting framework.  See Kemp v. Metro-North R.R., No. 04 Civ.

9926, 2007 WL 1741256, at *16 (S.D.N.Y. June 14, 2007).  As with her discrimination claims,

plaintiff must initially establish a *prima facie* case of retaliation.  Specifically, she must show

that: (i) she participated in a protected activity known to the defendant; (ii) she suffered an

adverse employment action; and (iii) a causal connection existed between the protected activity

and the adverse employment action. See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.

3d 155, 159 (2d Cir. 1999).

        The only element of a plaintiff's *prima facie* case challenged by IHA is whether

she can establish that her participation in an ADA-protected act, that of taking disability leave,

-12-

was the cause of her eventual termination (Dkt. #44, pp. 24-26).[4]  Although IHA contends that

there is no direct evidence connecting her disability leave to her termination,  "[t]he causal

connection between the protected activity and the adverse employment action can be established

indirectly with circumstantial evidence, for example, by showing that the protected activity was

followed by discriminatory treatment or through evidence of disparate treatment of employees

who engaged in similar conduct or directly through evidence of retaliatory animus."  Sumner v.

United States Postal Service, 899 F. 2d 203, 209 (2d Cir. 1990).  "Proof of causal connection can

[also] be established indirectly by showing that the protected activity was followed closely by

discriminatory treatment".  DeCinto v. Westchester County Medical Center, 821 F. 2d 111, 115

(2d Cir. 1987) (emphasis in original), cert. denied, 484 U.S. 965 (1987).

        As discussed above, the evidence demonstrates that, at minimum, defendant could

have permitted plaintiff to leave between one and two hours early for an unexpected family

emergency.  These circumstances, along with the temporal proximity between plaintiff's return

from disability leave and her termination, create a genuine issue of material fact as to whether

the termination of plaintiff's employment was a pretext for discrimination.  Consequently,

defendant's motion is also denied insofar as it seeks to dismiss plaintiff's retaliation claim.


        **D.**    **New York State Human Rights Law**

        Plaintiff's opposition to IHA's motion for summary judgment appears to be

asserting a claim under the New York State Human Rights Law (N.Y. Executive Law §296, et

---

        [4]      I note that although not raised by either party the complaint alleges a distinct claim of
retaliation, namely that defendant contacted plaintiff's subsequent employer and had her terminated (Dkt.
#1, ¶31(4)).

*seq.*) (see Dkt. #47, p. 12 n. 2).  "While disability claims under the ADA and the NYSHRL are subject to the same analytical framework, the NYSHRL has a more expansive definition of 'disability' and does not require a plaintiff to identify a major life activity that is substantially limited by the alleged impairment . . . .  [U]nder state law, a disability need only be a demonstrable impairment; it does not have to substantially limit a major life function."  Ruhling v. Tribune Co., No. 04-CV-2430, 2007 WL 28283, at *14 (E.D.N.Y. January 3, 2007) (internal quotation marks and citation omitted).

However, IHA argues that plaintiff is precluded from asserting this claim because no such cause of action was alleged in the complaint (Dkt. #52, Point II).  In a separate Text Order (Dkt. #55), I am directing the parties to address the question of whether the claim may be considered in this case.


**CONCLUSION**

For these reasons, I recommend that IHA's motion for summary judgment (Dkt. #48) be DENIED.  Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance.  <u>See</u>, <u>e.g.</u>, <u>Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.</u>, 840 F. 2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>  <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**SO ORDERED.**

DATED:        July 30, 2007

<u>/s/ Jeremiah J. McCarthy</u>
JEREMIAH J. MCCARTHY
United States Magistrate Judge